WILMER CUTLER PICKERING
 HALE AND DORR LLP
Michael A. Mugmon (SBN: 251958)
michael.mugmon@wilmerhale.com
Jonathan A. Shapiro (admitted *pro hac vice*)
jonathan.shapiro@wilmerhale.com
1117 S. California Avenue
Palo Alto, CA 94304
Tel. (650) 858-6000
Fax. (650) 858-6100

Attorneys for Defendant
GOMEZ, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BROWSERCAM, INC.,<br><br>       Plaintiff,<br><br>vs.<br><br>GOMEZ, INC.,<br><br>       Defendant. | Case No. C 08-2959-WHA<br><br>**DECLARATION OF JONATHAN A. SHAPIRO, ESQ. IN SUPPORT OF GOMEZ, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR TRANSFER**<br><br>Date:  September 25, 2008<br>Time:  8:00 a.m.<br>Place:  Courtroom 9, 19th Floor<br><br>The Hon. William H. Alsup<br>United States District Court Judge |

1       I, Jonathan A. Shapiro, declare as follows:

2       1.     I am a Partner with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, counsel of record for Gomez, Inc. in the above-referenced action.  I am an active member in good standing of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts and am admitted *pro hac vice* in this Court for this matter.  I submit this Declaration in support of Gomez, Inc.'s Notice of Motion; Motion to Dismiss or Transfer; Memorandum of Law in Support of Defendant's Motion to Dismiss or Transfer.

2.     Attached hereto as <u>Exhibit 1</u> is a photocopy of a fully executed Asset Purchase Agreement Regarding the Purchase and Sale of Assets of BrowserCam, Inc. by Gomez, Inc., dated June 19, 2007 (excluding the schedules and exhibits attached thereto), which I understand is the Agreement referred to in the Complaint filed in this action.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on July 22, 2008 in Palo Alto, California.


                                            /S/
                               Jonathan A. Shapiro, Esq.

                               Wilmer Cutler Pickering Hale and Dorr LLP
                               1117 S. California Avenue
                               Palo Alto, CA 94304
                               Tel: (650) 858-6000
                               Fax: (650) 858-6100

                               jonathan.shapiro@wilmerhale.com

                               Attorney for Defendant GOMEZ, INC.

- 1 -

DECLARATION OF JONATHAN A. SHAPIRO, ESQ.

ASSET PURCHASE AGREEMENT

Regarding the Purchase and Sale of Assets of

BROWSERCAM, INC.

By

GOMEZ, INC.

June 19, 2007

# TABLE OF CONTENTS

Page

1. PURCHASE AND SALE OF ASSETS ..................................................................................... 1
  1.1   Purchase and Sale of Assets ............................................................................... 1
  1.2   Excluded Assets ................................................................................................... 3
  1.3   Assumed and Excluded Liabilities ...................................................................... 3
  1.4   Closing ................................................................................................................. 4
  1.5   Consideration ...................................................................................................... 4
  1.6   Delivery ............................................................................................................... 5

2. REPRESENTATIONS AND WARRANTIES OF SELLER ............................................... 6
  2.1   Organization, Good Standing and Qualification ................................................ 6
  2.2   Authority and Noncontravention ........................................................................ 6
  2.3   Solvency/Liabilities ............................................................................................ 8
  2.4   Title ..................................................................................................................... 8
  2.5   Contracts ............................................................................................................. 8
  2.6   Brokers ................................................................................................................ 8
  2.7   Litigation ............................................................................................................. 8
  2.8   Intellectual Property ........................................................................................... 9
  2.9   Tax Returns ........................................................................................................ 10
  2.10  Restrictions on Business Activities .................................................................. 11
  2.11  Condition of Tangible Assets ........................................................................... 11
  2.12  Disclosure ......................................................................................................... 11
  2.13  Compensation Agreement ................................................................................ 11

3. REPRESENTATIONS AND WARRANTIES OF PURCHASER ................................... 11
  3.1   Authority ........................................................................................................... 11
  3.2   Compliance with Other Instruments ................................................................. 11
  3.3   Brokers .............................................................................................................. 12

4. COVENANTS ...................................................................................................................... 12
  4.1   Seller to Cease Operations ............................................................................... 12
  4.2   Access ................................................................................................................ 12
  4.3   Confidentiality .................................................................................................. 12
  4.4   Public Announcements ...................................................................................... 12
  4.5   Name Change .................................................................................................... 12
  4.6   Further Cooperation .......................................................................................... 12
  4.7   Tax Matters ....................................................................................................... 13
  4.8   Accounts ............................................................................................................ 13
  4.9   Bulk Transfer Laws ........................................................................................... 14
  4.10  Consents ............................................................................................................ 14
  4.11  Employee Matters ............................................................................................. 14

5. ADDITIONAL CLOSING DELIVERIES TO PURCHASER ........................................ 14

**5.1**  CEO Certificate ........................................................................................... 14

**5.2**  Execution of Services and Non-Competition Agreements ........................... 15

**6.**   SURVIVAL OF REPRESENTATIONS AND WARRANTIES;
      INDEMNIFICATION; RIGHT OF SET-OFF ...................................................... 15

**6.1**  Survival of Representations and Warranties ................................................ 15

**6.2**  Indemnification ........................................................................................... 15

**6.3**  Right to Set-Off .......................................................................................... 16

**6.4**  Third-Party Claims ...................................................................................... 16

**6.5**  Limitations .................................................................................................. 16

**6.6**  Liquidated Damages .................................................................................... 16

**7.**   MISCELLANEOUS ......................................................................................... 17

**7.1**  Compliance with Laws ................................................................................ 17

**7.2**  Confidentiality of Terms ............................................................................. 17

**7.3**  Governing Law; Jurisdiction ...................................................................... 17

**7.4**  Entire Agreement; Interpretation ................................................................ 17

**7.5**  Notices ........................................................................................................ 18

**7.6**  Counterparts ................................................................................................ 18

**7.7**  No Ongoing Obligations .............................................................................. 18

**7.8**  Transaction Expenses .................................................................................. 18

**7.9**  Amendment .................................................................................................. 18

**7.10**  Miscellaneous ............................................................................................. 18

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is entered into on June 19, 2007 by and between Gomez, Inc., a Delaware corporation (the "*Purchaser*"), and BrowserCam, Inc., a California S corporation ("*Seller*").

## BACKGROUND

Seller provides certain software and services that enable Internet content providers to test their URLs on multiple browsers (the "*Business*").  Seller wishes to sell to Purchaser and Purchaser wishes to acquire from Seller certain assets, and assume certain liabilities, related to the Business, as set forth in (and subject to the terms and conditions of) this Agreement.

NOW, THEREFORE, in consideration of the mutual promises in this Agreement and for other good and valuable consideration, the parties hereby agree as follows.

## AGREEMENT

1.  **PURCHASE AND SALE OF ASSETS.**

**1.1** <u>Purchase and Sale of Assets</u>.  Subject to the terms and conditions of this Agreement and in reliance on the representations, warranties and covenants set forth in this Agreement, the Seller shall cause to be sold, assigned, transferred, conveyed and delivered to Purchaser at the Closing (as defined below), and Purchaser shall purchase and acquire at the Closing, all right, title and interest of the Seller in and to the assets used in connection with the Business (collectively the "*Purchased Assets*"), including, but not limited to, the following assets:All rights under the Company's customer contracts (the "*Customer Contracts*"), all past and present client and customer lists related to the Business and other customer data and information, all other goodwill relating to the Business and all customer assets, whether or not tangible;

**(b)**     All equipment and other tangible assets used in the operation of the data center, operational infrastructure, and customer sales and support services related to the Business ("*Equipment*");

**(c)**     All ideas, concepts, discoveries, inventions, developments, technologies, works of authorship, trade secrets, software, firmware, tools, processes, techniques, know-how, data, plans, devices, apparatuses, specifications, designs, circuits, layouts, mask works, algorithms, programs, code, documentation and other material and information, tangible or intangible, whether or not it may be patented, copyrighted or otherwise protected (including all versions, modifications, enhancements and derivative works thereof) which are in any case related to the Business, including without limitation (x) any and all patent rights, copyright rights, mask work rights, trade secret rights, *sui generis* database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor) and (y) any rights to any of the foregoing granted pursuant to a license or other agreement (collectively, the "*Seller IP Rights*").  Seller IP Rights include, for example, all right, title and interest in and to the following:

(i)    any and all proprietary computer software (including software programs, objects, modules, routines, algorithms and any other software code) in both source code and object code form used in or with regard to the Business (the "*Software*");

(ii)    any and all patent applications and patents, all invention disclosures and utility models related thereto and ideas and inventions disclosed and claimed therein, all patent applications claiming the benefit of the filing date of any such patent or patent application, all continuations, divisionals, renewals, substitutes, extensions, conversions, continuations-in-part, reissues, provisionals, reexaminations or other equivalents thereof, and all patents issuing in respect of any of the foregoing) (the "*Patent Rights*");

(iii)    any and all documentation (whether in tangible or intangible format), files, and original documents owned or controlled by Seller that are in Seller's possession and which, in each case, directly or indirectly relate to the other Purchased Assets (collectively, the "*Documentation*") including, but not limited to, (i) programmers' notes or logs, source code annotations, user guides, manuals, instructions, software architecture designs, layouts, and any other designs, plans, drawings, documentation, laboratory notebooks, materials, supplier lists, net lists, photographs, blueprints, media, memoranda and white papers (ii) business plans, presentations and market research developed by Seller and (iii) those relating to the Seller IP Rights, including all applications and letters patent included in the Patent Rights and Patents, all applications and trademarks included in the Trademark Rights (as defined below) and all applications for copyright registration and copyright registrations included in the Copyright Rights (as defined below);

(iv)    any and all inventions and discoveries (whether or not patentable), licenses, trade secrets, know-how, proprietary processes and formula, algorithms, structures, and other proprietary information and technologies incorporated or embodied in, or related to, the Business or other Purchased Assets which (in each case) would derive their value in whole or in part from the fact that they have been kept confidential (collectively, the "*Trade Secrets*");

(v)    all copyrights, copyright registrations and applications with regard to the Software, Documentation or Trade Secrets, and all related rights in mask works and works of authorship, including moral rights (the "*Copyright Rights*");

(vi)    all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefor (the "*Trademark Rights*"); and

(vii)    all domain name registrations, s and the like and the applications therefor related to www.browsercam.com (or any other IP address or network address currently or previously used in connection with the Business) (the "*Domain Names*");

(d)    All causes of action and enforcement rights to pursue damages, injunctive relief and other remedies, whether currently pending, filed, or otherwise, for the Seller IP Rights, and all rights to profits and damages due or accrued, arising out of or in connection with, any and all past, present or future infringement, misappropriation or other violation of the Seller IP Rights, including all rights to pursue damages, injunctive relief and other remedies for past,

current and future infringement of the Seller IP Rights, and all rights of Seller to collect royalties under the Seller IP Rights;

        **(e)**    All rights of the Seller under the other contracts, agreements and licenses listed on <u>Schedule 1.1(e)</u> and any and all contracts, agreements and licenses pertaining to search optimization, advertising search or infrastructure/co-location (the "***Other Contracts***," and, collectively with the Customer Contracts, the "***Contracts***");

        **(f)**    All business development, positioning, marketing and sales related material;

        **(g)**    All other assets listed on <u>Schedule 1.1(g)</u> utilized in the Business on a day to day basis (provided that the failure to list an asset on <u>Schedule 1.1(g)</u> shall not be deemed a failure to include such asset as a Purchased Asset hereunder); and

        **(h)**    For the avoidance of doubt, the parties agree that all transactions posted in Seller's order systems and accounts from and after the Closing Date (as defined below) for which cash is subsequently deposited into sellers bank accounts from and after the Closing Date (as defined below) shall inure to the benefit of the Purchaser, and Seller shall cause to be delivered to the Purchaser any and all proceeds in respect of such transactions that are posted prior to such time as such bank accounts are formally transferred to Purchaser's name.

    **1.2**    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary herein, Seller shall not cause to be sold, assigned, transferred, conveyed or delivered, to Purchaser, and Purchaser shall not purchase, and the Purchased Assets shall not include, any right, title or interest of Seller in, any of the following assets (the "***Excluded Assets***"):

        **(a)**    All cash, cash equivalents and bank accounts owned by Seller at the Closing Date (as defined below);

        **(b)**    All real property interests, including any and all real property rights granted by lease or other agreement (which leases and agreements shall not, for the avoidance of doubt, be deemed to be Contracts under this Agreement);

        **(c)**    All accounts receivable;

        **(d)**    All rights of Seller under this Agreement and the Ancillary Agreements; and

        **(e)**    All corporate records including without limitation accounting documents, tax returns, audit materials, legal records, board and stockholder minutes and related correspondence.

    **1.3**    <u>Assumed and Excluded Liabilities</u>.

        **(a)**    Subject to the terms and conditions of this Agreement, Purchaser shall, on the Closing Date, assume, perform and discharge when due the responsibilities, liabilities and

obligations of Seller under the Contracts arising after the Closing Date (the "*Assumed Liabilities*").

(b)    Seller shall retain, and shall be responsible for paying, performing and discharging when due, and the Purchaser shall not assume or have any responsibility for, all liabilities of Seller not expressly assumed by Purchaser pursuant to paragraph (a) of this Section 1.3 (the "*Excluded Liabilities*").    The term Excluded Liabilities shall specifically include any and all taxes now or hereafter properly imposed on Seller relating to the conduct of Seller's business or attributable to the sale of Purchased Assets pursuant to this Agreement and any and all liabilities and obligations relating to the conduct of the business, current and former employees or contractors of the Seller, any and all trade payables, obligations under employee benefit plans or other accounts payable of Seller, and any liabilities and obligations under contracts or agreements between the Seller and any other party (except as set forth in Section 1.3(a) above). The Excluded Liabilities shall include, but not be limited to:

(i)    all liabilities arising out of or relating to the Excluded Assets;

(ii)    any and all obligations with respect to Seller's outstanding capital stock, options, warrants or other securities; and

(iii)    any liabilities of Seller under this Agreement.

1.4    Closing. Subject to the terms and conditions of this Agreement, the closing of the sale of the Purchased Assets to the Purchaser (the "*Closing*") shall take place at the offices of Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP, 610 Lincoln Street, Waltham, Massachusetts 02451 at 12:00 p.m. on June 19, 2007 or at such other place and time as the parties agree orally or in writing. For purposes of this Agreement, "*Closing Date*" shall mean the time and date as of which the Closing actually takes place.

1.5    Consideration. The Purchaser shall pay the following consideration for the Purchased Assets:

(a)    a cash amount equal to $1,500,000, payable by Purchaser to Seller at Closing by wire transfer of immediately available funds (the "*Cash Payment*"); and

(b)    a non-interest bearing promissory note in the principal amount of $725,000 and in the form set forth as Exhibit A (the "Promissory Note"), the principal amount of which shall be subject to Purchaser's set-off rights as set forth in Section 6.3.

(c)    Subject to the terms and conditions of this Agreement (including without limitation Section 6 hereof), on or before August 15, 2008 (subject to extension on account of the dispute resolution process referred to in Section 1.5(d)), the Purchaser shall pay cash by wire transfer of immediately available funds (in accordance with wire instructions received by Purchaser not less than five days prior to the date of payment) in an amount, if positive, equal to (i)(A) the Applicable Bookings Amount minus (B) $600,000; multiplied by 1.25 (the "*Earn-Out Payment*"). For purposes of this Agreement, "*Applicable Bookings Amount*" means the amount of subscription revenue booked by Purchaser (x) in accordance with Seller's existing automated

online sign-up procedure and/or Purchaser's accounting practices, in either case for payments due within 30 days under written, fully executed contracts with *bona fide* customers who are not affiliates of Seller (or affiliates of any of Seller's directors, officers or stockholders) having no right of cancellation or refund and having payment terms of not greater than 30 days, (y) for the period from and including July 1, 2007 to and including June 30, 2008 (the "***Applicable Period***") and (z) on account of sales by the Purchaser of products and services containing, or derived from, the Seller IP Rights ("***BrowserCam Products and Services***"). The Purchaser agrees to account separately for such bookings. Additionally, the Purchaser agrees (i) not to make any material reductions in the list price of the BrowserCam Products and Services without Seller's consent, and (ii) to expend not less than $250,000 in the aggregate on (i) marketing the BrowserCam Products and Services and (ii) providing infrastructure (including human resources), marketing and sales support for the BrowserCam Products and Services. Purchaser shall prepare and deliver to Seller within thirty (30) days after Closing a sales and marketing plan (including a pro-forma budget relating to the same) for the Browsercam Products and Services during the Applicable Period (the "Sales and Marketing Plan"). Additionally, Purchaser shall provide a monthly summary of the Seller's online management and reporting system single screen shot (which, for the avoidance of doubt, shall be a Purchased Asset) at reasonable intervals during the Applicable Period. Purchaser also agrees to use commercially reasonable efforts to achieve the maximum Applicable Bookings Amount on Seller's behalf; provided that Seller acknowledges that Purchaser makes no guarantee whatsoever as to any Applicable Bookings Amount and that, except as specifically provided above, it will have complete discretion to market and sell the BrowserCam Products and Services as it sees fit.

(d)    Unless Seller submits to Purchaser a letter within 30 calendar days of receipt of Earn-Out Payment taking exception to Buyer's calculation of the Earn-Out Payment, such payment shall be deemed final and accepted by Seller. If Seller submits such a letter describing exceptions to Purchaser's calculation of Applicable Bookings Amount or Earn-Out Payment, then (1) for 10 days after the date Purchaser receives such letter, Seller and Purchaser will use their respective commercially reasonable efforts to agree on the calculation of the Applicable Bookings Amount and (2) lacking such agreement, the matter will be referred to a reasonably agreeable independent accounting firm (the "Accountant"). The Accountant shall act as experts and not as arbiters to calculate, based solely on the written submission of Purchaser, on the one hand, and Seller, on the other, and not based upon any independent investigation, the Applicable Bookings Amount. Furthermore, the Accountant shall be instructed and agree to establish a process and timeline for resolution of the disputed items set forth in the dispute letter so that the Accountant's determination of Applicable Bookings Amount is delivered to the parties within 30 days of such referral. The Accountant's determination will be the conclusive Applicable Bookings Amount and final and binding on Purchaser and Seller Parties for all purposes under this Agreement. The fees of the Accountant shall be borne by Purchaser, on one hand, and Seller, on the other hand, in inverse proportion to the manner in which such Person prevails on the terms resolved by the Accountant, which proportionate allocation shall be calculated on an aggregate basis based on the relative dollar values of the amounts in dispute and shall be computed by the Accountant at the time the determination of the Accountant is rendered.

1.6    <u>Delivery</u>. At the Closing:

      **(a)**     The Purchaser shall deliver the Cash Payment and the Promissory Note to Seller;

      **(b)**     Seller shall deliver to the Purchaser the Purchased Assets;

      **(c)**     Seller shall deliver to the Purchaser an executed and notarized original of a Patent Assignment in the form attached as <u>Exhibit B</u> hereto (the "*Patent Assignment*");

      **(d)**     Seller shall deliver to the Purchaser a duly executed counterpart to a Bill of Sale and Assignment and Assumption Agreement in the form attached as <u>Exhibit C</u> hereto (collectively with the Trademark Assignment and the Patent Assignment, the "*Ancillary Agreements*");

      **(e)**     Seller shall deliver to the Purchaser all consents required to assign the Contracts to the Purchaser, in form and substance reasonably satisfactory to the Purchaser (the "*Required Consents*") ;

      **(f)**     Seller shall deliver to the Purchaser such other and further documents as Purchaser shall reasonably request to demonstrate the purchase and sale of the Purchased Assets by the Purchaser as contemplated herein; and

**2.**    **REPRESENTATIONS AND WARRANTIES OF SELLER.**

Seller hereby represents and warrants to Purchaser that the statements in this Section 2 are true and correct as of the Closing Date, subject to such qualifications as set forth in the disclosure schedule attached hereto as <u>Schedule 2</u> and provided to Purchaser (the "*Seller Disclosure Schedule*").

    **2.1**    <u>Organization, Good Standing and Qualification</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California  and has all requisite corporate power and authority to own, lease and otherwise hold and operate its properties and other assets and to carry on its business as it is now being conducted.  Seller is duly qualified or licensed as a foreign corporation to do business and is in good standing in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing has not had, and could not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the financial condition, business, assets, condition or affairs of the Seller or the Purchased Assets.

    **2.2**    <u>Authority and Noncontravention</u>.

      **(a)**     Seller has all necessary corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to carry out its obligations hereunder and to consummate the transaction contemplated hereby and thereby.  The execution and delivery of this Agreement and the Ancillary Agreements by Seller and the consummation hereby and thereby have been duly and validly authorized by all necessary corporate action on the part of Seller, including approval and adoption by Seller's stockholders. This Agreement and

the Ancillary Agreements have been duly and validly executed and delivered by Seller and, assuming due execution and delivery by the Purchaser, constitute legal, valid and binding obligations of the Seller, enforceable against Seller in accordance with their respective terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to the effect of principles of equity.

(b)    The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not conflict with, constitute a breach of or default under, or violate (i) the Seller's Restated Certificate and Bylaws, (ii) any loan or credit agreement, bond, debenture, note, mortgage, indenture, guarantee, lease, purchase order or other contract, commitment, agreement, instrument, arrangement, understanding, obligation, undertaking, permit, concession, franchise or license, whether oral or written or (iii) any law, rule, regulation, order, judgment or decree applicable to Seller or by which the Purchased Assets are bound or affected, nor will such execution, delivery or performance result in the imposition of any lien, encumbrance, security interest, pledge, hypothecation, mortgage, charge or other security interest on any of the Purchased Assets. The Required Consents are listed in <u>Section 2.2</u> of the Seller Disclosure Schedule, are valid and legally binding upon the respective parties thereto and are legally sufficient to assign all rights, titles and interests in and to the Contracts without any additional consent or waiver.

(c)    Seller is not currently in violation or default of any provision of the Seller's Restated Certificate or Bylaws, or of any instrument, judgment, order, writ or decree to which it is a party or by which it is bound, or, to its knowledge, of any provision of any federal or state statute, rule or regulation applicable to Seller. The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated thereby by Seller do not and will not require the consent, approval, order, permit or authorization from, or registration, filing or notification with, any domestic or foreign governmental agency, regulatory or administrative authority, agency or commission, any court, tribunal or arbitral body, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental authority.

**2.3**     Solvency/Liabilities.  Immediately after giving effect to the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements: (i) Seller will be able to pay its liabilities, if any, as they come due in the ordinary course of business; (ii) Seller will not have unreasonably small capital with which to conduct any contemplated post-Closing business; and (iii) Seller will have assets (calculated at fair market value) that exceed its liabilities.  No order or decree has been made or petition presented, or resolution passed for the winding-up or liquidation of Seller and there is not outstanding: (i) any appointment of a receiver over the whole or part of the undertaking of assets of Seller; (ii) any petition or order for administration of Seller; (iii) any voluntary arrangement between Seller and any of their respective creditors; (iv) any distress or execution or other process levied in respect of Seller which remains undischarged; and (v) any unfulfilled or unsatisfied judgment or court order against Seller.

**2.4**     Title.  Seller has good and marketable title to all the Purchased Assets, free and clear in each case of all mortgages, liens, loans, pledges, charges, claims, defects of title, restrictions, infringements, security interests, or encumbrances of any kind or character.  Seller has the sole and exclusive ownership to all of the Purchased Assets and all Purchased Assets are located in the State of California.  Purchaser shall be able to use, exercise, and enjoy the benefits of the Purchased Assets in the same manner as Seller prior to the Closing.

**2.5**     Contracts.  Section 2.5 of the Seller Disclosure Schedule lists each contract or other agreement to which Seller is a party (whether a customer contract, supplier or reseller agreement, real property lease, license, or other contract or agreement).  Except as set forth in Section 2.5 of the Seller Disclosure Schedule, each such contract or other agreement is a Contract to be assigned and assumed by the Purchaser pursuant to Section 1.1 and Section 1.3.  Each contract or agreement required to be listed on Section 2.5 of the Seller Disclosure Schedule is in full force and effect and binding on each party thereto, no such party to any such contract or agreement is in breach of default, and there has been no action or omission by either party or other event which, with or without the passage of time and/or the giving of notice, would constitute such a breach or default under any such contract or agreement.

**2.6**     Brokers.  Other than fees payable to Arbor Advisors in the amount of 10% of the proceeds payable hereunder (which fees, for the avoidance of doubt, shall be the responsibility of Seller) no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Seller.

**2.7**     Litigation.  There is no action, suit, proceeding or investigation pending or, to Seller's knowledge, currently threatened against Seller that questions the validity of this Agreement or any Ancillary Agreement, or the right of Seller to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that could result, either individually or in the aggregate, in any material adverse changes in the assets (including the Purchased Assets), liabilities (including the Assumed Liabilities), condition, prospects or affairs of Seller, financially or otherwise, nor is Seller aware that there is any basis for the foregoing.  The foregoing includes, without limitation, actions, suits, proceedings or investigations pending

or threatened involving the prior employment of any of Seller's employees, their use in connection with Seller's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers. Seller is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by Seller currently pending or that Seller intends to initiate.

**2.8** **Intellectual Property**.

(a)    Section 2.8 of the Seller Disclosure Schedule lists the material components of the Software, and all Documentation, Trade Secrets, registered copyrights and applications for registration of copyrights, Patent Rights, and Domain Names, if any, owned by or licensed to Seller. The Seller has delivered to the Purchaser complete and correct copies of, and Section 2.8 of the Seller Disclosure Schedule lists, all license agreements relating to Seller IP Rights to which Seller is a party. The conduct of the Business, as presently conducted and as currently proposed to be conducted by the Purchaser, does not conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to any right, lien, security interest or encumbrance relating to, any Seller IP Rights obtained by license.

(b)    The Seller IP Rights comprise all intellectual property and proprietary rights used in or necessary to carry on the Business as presently conducted or as currently proposed to be conducted.

(c)    All Patent Rights and all trademark registrations and trademark applications have been validly obtained, all necessary affidavits of continuing use have been filed, and all necessary maintenance fees have been paid to continue all such rights in effect.

(d)    The use in the Business of the Software, the Documentation, or any of the other Seller IP Rights has not infringed, and does not infringe, dilute or otherwise violate the intellectual property or other proprietary rights of any other person.

(e)    There is no litigation pending or, to the knowledge of Seller, threatened with respect to, and neither Seller nor any of its subsidiaries has been notified of or, to the knowledge of Seller, has any of Seller's customers been notified of, any possible infringement or other violation by Seller or any of its subsidiaries of the rights of any person with regard to the conduct of the Business.

(f)    Each employee and officer of Seller has executed a Proprietary Information and Inventions Agreement or similar agreement, and each consultant to Seller has executed a Consulting Agreement in substantially the forms provided to Purchaser, and such agreements are in full force and effect. Seller is not aware that any of its employees, officers or consultants are in violation thereof, and Seller will use its commercially reasonable efforts to prevent such violation.

(g)    To the knowledge of Seller, no person is infringing on or otherwise violating any right of Seller with respect to the Seller IP Rights.

**(h)**  Section 2.8 of the Seller Disclosure Schedule sets forth a complete and correct list of all options, rights, licenses or interests of any kind relating to intellectual property granted to Seller or any of its subsidiaries (other than software licenses for generally available software such as Lotus 1-2-3, WordPerfect and the like and generally available system development tools), or granted by Seller or its subsidiaries to any other person.

**(i)**  All of the Software is owned by Seller or Seller has the right to use, modify, copy, sell, distribute, sublicense and make derivative works from such Software, free and clear of any limitations or liens.  There is no open source, public source or freeware software or any modification or derivative thereof, including any version of any software licensed pursuant to any GNU general public license or limited general public license, that is used in, incorporated into, integrated or bundled with the Software.  To the extent any Software is not owned by the Seller but is marketed or distributed to customers of Seller, (i) third party rights to such parts of the Software have been identified in Section 2.8 of the Seller Disclosure Schedule, (ii) all necessary licenses have been obtained and complied with, (iii) no royalties or payments are due now or in the future and (iv) there are no obligations to provide access to any third party to, or permit any third party to copy, modify or distribute, any of the Software.

**(j)**  None of the source code comprising the Software has been published or disclosed by Seller or, to the knowledge of Seller, by any other person to any person except pursuant to licenses or Contracts requiring such other persons to keep such source code confidential (which licenses or Contracts will be enforceable by Purchaser after the Closing to an extent sufficient to fully exploit all such source code to conduct the Business).

**(k)**  Seller has taken all reasonable and necessary steps to protect the Seller IP Rights, and to the knowledge of Seller no Seller IP Rights are in jeopardy of being lost through failure to act by Seller or any of its subsidiaries.

**2.9**  Tax Returns.  Seller has filed all tax returns and reports (including information returns and reports) as required by law.  These returns and reports are true, correct and complete in all material respects.  Seller has not made any elections pursuant to the Internal Revenue Code of 1986 (the "*Code*") (other than elections that relate solely to methods of accounting, depreciation or amortization) that would have a material effect on Seller, its financial condition, its business as presently conducted or any of its properties or material assets (including the Purchased Assets).  Seller has never had any tax deficiency proposed or assessed against it and has not executed any waiver of any statute of limitations on the assessment or collection of any tax or governmental charge.  None of Seller's federal income tax returns and none of its state income or franchise tax or sales or use tax returns have ever been audited by governmental authorities.  Seller has not incurred any taxes, assessments or governmental charges other than in the ordinary course of business and Seller has made adequate provisions on its books of account for all taxes, assessments and governmental charges with respect to its business, properties and operations.  Seller has withheld or collected from each payment made to each of its employees, the amount of all taxes (including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) required to be withheld or collected therefrom, and has paid the same to the proper tax receiving officers or

authorized depositories. There are no liens for Taxes (other than for current Taxes not yet due and payable) upon the assets of the Company.

**2.10** <u>Restrictions on Business Activities</u>. There is no agreement, commitment, judgment, injunction, order or decree binding upon Seller or to which Seller is a party which has or could reasonably be expected to have the effect of prohibiting or materially impairing (a) any business practice material to Seller, (b) any acquisition of property by Seller, or (c) the conduct of business by Seller as currently conducted or as proposed to be conducted.

**2.11** <u>Condition of Tangible Assets</u>. The tangible Purchased Assets are in good operating condition and repair (normal wear and tear excepted).

**2.12** <u>Disclosure</u>. Seller has disclosed to the Purchaser all material information relating to the Business and none of the representations or warranties made by Seller in this Agreement and in the Assignment Agreements contains or will contain at the Closing any untrue statement of a material fact and Seller has not withheld any information that would make any of the representations or warranties contained herein, as qualified by the Seller Disclosure Schedule, not misleading.

**2.13** <u>Compensation Agreement</u>. All compensation agreements between Seller and/or John Witchel and Kenn Min Chong previously provided to the Purchaser (including any compensation agreement arrangement entered into with respect to the transactions contemplated by this Agreement or the employment of Kenn Min Chong by Gomez after the date hereof) are described on <u>Section 2.13</u> to the Seller Disclosure Schedule, and a true, correct and complete copy of such agreement (to the extent in writing) are attached to <u>Section 2.13</u> of the Disclosure Schedule.

**3.** **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

Purchaser hereby represents and warrants to Seller as follows:

**3.1** <u>Authority</u>. Purchaser is a corporation duly incorporated and in good standing under the laws of the State of Delaware. Purchaser has the right and authority to enter into, execute, deliver and perform this Agreement and the Ancillary Agreements and to carry out the obligations hereunder and thereunder, without the need for any further approval of its Board of Directors or Stockholders. All action on Purchaser's part required for the lawful execution and delivery of this Agreement and the License Agreement has been taken. Upon its execution and delivery by Purchaser, this Agreement and the License Agreement will be valid and binding obligations of the Purchaser in accordance with their respective terms.

**3.2** <u>Compliance with Other Instruments</u>. Purchaser is not in violation or default of any provision of its Restated Certificate of Incorporation or Bylaws, or of any instrument, judgment, order, writ, decree or contract to which it is a party or by which it is bound, or, to its knowledge, of any provision of any federal or state statute, rule or regulation applicable to Purchaser. The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not result in any such violation or default or be in conflict with or constitute, with or without the

passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event that results in the creation of any lien, charge or encumbrance upon any of its material properties or assets.

    **3.3**   <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement and the Ancillary Agreements or the transactions contemplated by this Agreement and the Ancillary Agreements based upon arrangements made by or on behalf of Purchaser.

    **4.**    COVENANTS.

    **4.1**   <u>Seller to Cease Operations</u>.  Seller agrees to dissolve itself within 30 days following the final earn-out payment or resolution thereof by filing a Certificate of Dissolution has been filed with the Secretary of State of the State of California.  Until such time as such Certificate of Dissolution is effective, Seller will maintain its solvency and will not engage in the Business or conduct any operations other than such operations as are necessary to perform its obligations and exercise its rights hereunder, and to wind up its affairs.

    **4.2**   <u>Access</u>.  If the Purchaser reasonably requires information relating to the Purchased Assets or Assumed Liabilities that for any reason were not included in the Purchased Assets conveyed at Closing, Seller shall promptly make such information available to the Purchaser, including by making its employees, counsel, accountants, bankers and other representatives available to Purchaser.

    **4.3**   <u>Confidentiality</u>.  Seller shall keep confidential and shall cause its subsidiaries to, and shall use commercially reasonable efforts to cause its affiliates and their respective officers, directors, employees and advisors to, keep confidential all non-public information relating to the Purchased Assets or the Assumed Liabilities, except as required by compulsory legal process.

    **4.4**   <u>Public Announcements</u>.  Except as otherwise required by applicable law or regulation, Seller shall not issue or cause the publication of any press release or other public announcement with respect to the transactions contemplated hereby or by the Ancillary Agreements without the consent of Purchaser.

    **4.5**   <u>Name Change</u>.  From and after the Closing Date, Seller and its subsidiaries shall cease using in commerce the name "BrowserCam" or any derivation thereof, or any other Trademark Rights comprising the Purchased Assets.  Within one business day after the Closing, Seller shall amend its organizational and governing documents to change its name to a name not including or similar to "BrowserCam."

    **4.6**   <u>Further Cooperation</u>.  At the request of Purchaser, at any time following the Closing Date through August 15, 2008, Seller shall execute and deliver such other instruments and documents and do and perform such other acts as may be reasonably necessary for the operation of the Business by Purchaser and effecting completely the consummation of the transactions contemplated hereby, including execution, acknowledgment and recordation of other such papers, using reasonable efforts to obtain the same from the respective inventors or

authors as necessary for perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby. Seller hereby constitutes and appoints the officers of Purchaser, its successors and assigns, the true and lawful attorney and attorneys of Seller, with full power of substitution, in the name of Purchaser or in the name and stead of Seller, but on behalf of, for the benefit and at the expense of Purchaser, its successors and assigns: (i) to collect, demand and receive any and all Purchased Assets hereby sold and assigned to Purchaser or intended so to be; (ii) to institute and prosecute any and all actions, suits or proceedings, at law, in equity or otherwise, which Purchaser may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Purchased Assets hereby sold and assigned to Purchaser or intended so to be, to defend or compromise any and all actions, suits or proceedings in respect of any of the Purchased Assets, and to do all such acts and things in relation thereto as Purchaser shall deem advisable; and (iii) to take any and all other reasonable action designed to vest more fully in Purchaser the Purchased Assets hereby sold and assigned to Purchaser or intended so to be and in order to provide for Purchaser the benefit, use, enjoyment and possession of such Purchased Assets. Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by it or upon its subsequent dissolution or in any manner or for any reason.

Seller hereby waives any conflict of interest with, and consents to, Purchaser retaining, and at Purchaser's expense, Seller's prosecution counsel for matters pertaining to Seller IP Rights. Seller hereby waives any privilege it may have that would otherwise prevent the communication or disclosure of information and documentation related in any way to the Purchased Assets between Purchaser and such counsel.

    **4.7**    <u>Tax Matters</u>. Purchaser and Seller shall mutually agree on the allocation of the consideration to be paid to the Seller by the Purchaser and the Assumed Liabilities among the Purchased Assets (such allocation, the "***Allocation***"). Purchaser and Seller further agree to act in accordance with the Allocation in any Tax Returns or similar filings. In the event that the United States Internal Revenue Service or any other taxing authority disputes the Allocation, if any, Seller or Purchaser, as the case may be, shall promptly notify the other party of the nature of such dispute. After the Closing Date, Seller and Purchaser agree to furnish or cause to be furnished to the other, upon request, such information (including access to books and records upon reasonable notice, during normal business hours and on terms that are reasonably convenient for both Seller and Purchaser) relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the filing of any Tax Return, the preparation for any Tax audit, or the prosecution or defense of any claim relating to any proposed Tax adjustment. Any out of pocket expenses incurred in connection therewith shall be borne by the party bearing responsibility for such Tax Return. Seller and Purchaser shall keep all such information and documents received by them confidential unless otherwise required by applicable law or regulation. If any claim, suit or proceeding shall be made by any taxing authority that could give rise to an additional payment of taxes related to the Purchased Assets or the Assumed Liabilities, the party responsible under this Agreement for the payment of such taxes shall control all proceedings arising in connection with such claim, suit or proceeding.

    **4.8**    <u>Accounts</u>. Seller hereby constitutes and appoints, effective as of the Closing, Purchaser and assigns it as true and lawful attorney of Seller with full power of substitution (i) to

collect for the account of the Purchaser any Purchased Assets and (ii) to institute and prosecute all proceedings which the Purchaser may in its sole discretion deem proper in order to enforce any right, title or interest in, to or under the Purchased Assets, and to defend or compromise any and all actions, suits or proceedings in respect of the Purchased Assets. All payments and reimbursements received by Seller or any of its affiliates in connection with or arising out of the Purchased Assets or Assumed Liabilities after the Closing shall be held by such person in trust for the benefit of Purchaser and, promptly upon receipt by such person of any such payment or reimbursement such person shall pay over to the Purchaser the amount of such payment or reimbursement without right of setoff. All payments and reimbursements received by the Purchaser or its affiliates in connection with or arising out of the Excluded Assets or Excluded Liabilities after the Closing shall be held by such person in trust for the benefit of Seller and, promptly upon receipt by such person of any such payment or reimbursement, such person shall pay over to Seller the amount of such payment or reimbursement without right of setoff. Seller covenants and agrees that it shall promptly forward to the Purchaser any mail (physical, electronic or otherwise), facsimile or telephone inquiries of actual or potential clients, customers, suppliers and vendors of or relating to Seller's or its subsidiaries' businesses, including customer orders.

      **4.9**   <u>Bulk Transfer Laws</u>. Purchaser and Seller each hereby waive compliance by Seller with the provisions of the "bulk sales", "bulk transfer" or similar laws or regulations of any jurisdiction. Seller agrees to indemnify and hold the Purchaser harmless against any and all claims, losses, damages, liabilities, costs and expenses incurred by Purchaser or any of its affiliates as a result of any failure to comply with any such "bulk sales," "bulk transfer" or similar laws or regulations.

      **4.10**   <u>Consents</u>. Seller acknowledges and agrees that all Required Consents shall be obtained at Seller's sole cost and expense.

      **4.11**   <u>Employee Matters</u>. Except as otherwise set forth herein, Seller agrees that the Purchaser shall be under no obligation to extend any employment, consultant or other service relationship with any employee of, or consultant or other service provider to, the Seller.

**5.**     **ADDITIONAL CLOSING DELIVERIES TO PURCHASER.**

      The Purchaser's obligation to purchase the Purchased Assets is subject to the delivery of each of the following to Purchaser at or prior to the Closing (any of which may be waived by the Purchaser, in whole or in part, in writing):

      **5.1**   <u>CEO Certificate</u>. The Purchaser shall have received a certificate signed by the Seller's Chief Executive Officer to the effect that (i) all of the representations and warranties made by the Seller in this Agreement shall have been accurate in all respects as of the date of this Agreement and shall be accurate in all respects as of the Closing as if made at the Closing, and (ii) all consents required to be obtained from third parties in connection with the assignment of the Contracts to Seller have been obtained, (iii) Seller's Board of Directors and stockholders have duly approved and adopted (by vote or written consent, in accordance with the California Corporations Code) this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby, (iv) all other obligations required to be performed by the

Seller on or prior to the Closing have been performed and (v) Seller is not a "foreign person" within the meaning of Section 1445 of the United States Internal Revenue Code.

5.2    Execution of Services and Non-Competition Agreements.

(a)    Kenn Min Chong shall have executed and delivered to the Purchaser an Employment Agreement in the form attached as Exhibit D, and a Proprietary Information and Inventions Agreement in form satisfactory to the Purchaser (collectively, the "*Kenn Employment Agreement*").

(b)    Roger McAulay shall have executed and delivered to the Purchaser a Consulting Agreement in the form attached hereto as Exhibit E (collectively, the "*Roger Consulting Agreement*").

(c)    Craig McAulay shall have executed and delivered to the Purchaser an Employment Agreement in the form attached hereto as Exhibit F, and a Proprietary Information and Inventions Agreement in form satisfactory to the Purchaser (the "*Craig Employment Agreement*").

(d)    Each of Kenn Min Chong, Craig McAulay, Roger McAulay and John Witchel shall have executed and delivered (i) in favor of the Seller, a Technology Assignment Agreement in the form attached as Exhibit G and (ii) in favor of the Purchaser, a Non-Competition Agreement in the form attached as Exhibit H.

6.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION; RIGHT OF SET-OFF.

6.1    Survival of Representations and Warranties.  The representations and warranties contained in Section 2 and Section 3.3 of this Agreement shall survive from and after the Closing until January 31, 2008 (the "*Survival Period*").  The representations and warranties contained in Section 3.1 and Section 3.2 of this Agreement shall survive until the Closing.

6.2    Indemnification.  Subject to the limitations set forth in Section 6.5 below, the Seller will indemnify and hold harmless the Purchaser and each of its affiliates, agents and representatives from and against any and all claims, causes of action, liabilities, losses (including lost profits and consequential damages), dues, assessments, fines, penalties, expenses or amounts paid in settlement, whether or not involving a third-party claim (collectively, "*Losses*") incurred or suffered as a result of, arising out of or directly or indirectly relating to:

(a)    any breach of, or inaccuracy in, any representation or warranty contained in Section 2 of this Agreement (provided such Losses are claimed by written notice to the Seller before the end of the Survival Period);

(b)    any breach of any individual of the agreements required to be executed pursuant to Section 5.2, any failure of Kenn Min Chong or Craig McAulay to provide services to the Purchaser in accordance with the Kenn Employment Agreement or Craig Employment Agreement, respectively (other than for a termination by Purchaser other than for Cause, as

defined in the applicable Employment Agreement), for a period from the Closing until June 30, 2008 in the case of the Kenn Employment Agreement or until December 31, 2007 in the case of the Craig Employment Agreement, or any failure of Roger McAulay to provide services to the Purchaser in accordance with the Roger Consulting Agreement;

        **(c)**     any unemployment insurance payable to Kenn Min Chong or Craig McAulay following any termination or expiration of their employment relationship with the Purchaser;

        **(d)**     any costs, fees or expenses incurred by Purchaser in obtaining any consent required to assign any Customer Contract or Other Contract to the Purchaser;

        **(e)**     any fees, costs or expenses of any third-party with whom Seller contracted for services in connection with the negotiation, execution or performance this Agreement (including any unpaid fees of Arbor Advisors or counsel to the Seller);

        **(f)**     any breach of the covenants set forth in Section 4 hereof;

        **(g)**     any losses incurred by the Purchaser as a result of fulfilling any "money back" or similar guarantee provided to customers of the Business prior to the Closing; or

        **(h)**     Any direct costs incurred in fulfilling the Seller's deferred revenue as of the Closing, to the extent such costs exceed $35,000 and were not disclosed pursuant to this Agreement.

     **6.3**    <u>Right to Set-Off</u>.  Without limiting Purchaser's other rights or remedies against Purchaser or any third party at law or in equity (except as set forth in Section 6.5), the Purchaser shall be entitled to set off the amount of any Losses for which it is entitled to be indemnified under Section 6.2 against amounts owed by Purchaser under either the Promissory Note or the Earn-Out Payment, at its discretion.

     **6.4**    <u>Third-Party Claims</u>.  The Purchaser shall have the sole and exclusive right and responsibility to defend any third-party claims that may give rise to Losses, and any costs associated with any such defense (including reasonable attorneys' fees and expenses) shall also be indemnifiable Losses hereunder.

     **6.5**    <u>Limitations</u>.  The rights of Purchaser to be indemnified under Section 6.2(a) of this Agreement shall, in the absence of fraud or intentional misrepresentation, be the sole remedy of Purchaser with respect to any breach of, or inaccuracy in, any representation or warranty contained in this Agreement.  Additionally, the Purchaser's sole recourse with respect to any indemnifiable Losses under Section 6.2(a) shall be its rights of set-off set forth in Section 6.3. Notwithstanding the foregoing, nothing in this Section 6.5 shall limit any right of the Purchaser to seek equitable relief (such as specific performance or an injunction) relating to any Losses indemnifiable under Section 6.2(a).

     **6.6**    <u>Liquidated Damages</u>.  Purchaser and Seller stipulate and agree that, as liquidated damages and not as penalty, the amount of Losses for which Purchaser shall be entitled to be

indemnified under Section 6.2(b) in respect of the Kenn Employment Agreement shall be $150,000, and that the amount of Losses for which Purchaser shall be entitled to be indemnified under Section 6.2(b) in respect of the Craig Employment Agreement shall be $50,000 in the event such Losses are due to other than the death or disability of such employee.

7.    MISCELLANEOUS.

    7.1    Compliance with Laws. Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

    7.2    Confidentiality of Terms. The parties hereto shall keep the terms and existence of this Agreement and the identities of the parties hereto confidential and shall not now or hereafter divulge any of this information to any third party except: (a) with the prior written consent of the other party; (b) as otherwise may be required by law or legal process, including in confidence to legal and financial advisors in their capacity of advising a party in such matters; (c) in confidence to its legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with financial transactions; or (d) creditors and other parties related to the wind down of operations of the Seller. Notwithstanding any provision to the contrary in this Agreement, Purchaser may also publicly file and record such documents as necessary to effectuate the transfer of the Purchased Assets as contemplated herein. Notwithstanding any provision to the contrary in this Agreement, Purchaser may disclose the existence of this Agreement to potential investors or customers.

    7.3    Governing Law; Jurisdiction. Any claim arising under or relating to this Agreement shall be governed by the internal substantive laws of the Commonwealth of Massachusetts without regard to principles of conflict of laws. Each party hereby agrees to jurisdiction and venue in the courts of the City of New York or the federal courts sitting therein, for all disputes and litigation arising under or relating to this Agreement, and each party waives and agrees not to assert any defenses or claims relating to improper venue, *forum non conveniens*, or similar defenses or claims, relating to this Agreement.

    7.4    Entire Agreement; Interpretation. The terms and conditions of this Agreement, including its exhibits, constitute the entire agreement between the parties with respect to the subject matter hereof, and merge and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions. Neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement. The terms "includes" and "including" are not limiting. These terms and conditions will prevail notwithstanding any different, conflicting or additional terms and conditions which may appear on any purchase order, acknowledgment or other writing not expressly incorporated into this Agreement.

**7.5**    Notices. All notices required or permitted to be given hereunder shall be in writing, shall make reference to this Agreement, and shall be delivered by hand, or dispatched by prepaid air courier or by registered or certified airmail, postage prepaid, addressed as follows:

If to Purchaser

Gomez, Inc.
10 Maguire Road, Suite 330
Lexington, MA  02421-3110
Attention:  Rick Darer, Chief Financial Officer

If to Seller

BrowserCam, Inc.
4104 24th Street
Suite 595
San Francisco, CA  94114
Attention:  John Witchel

with a copy to:

Marc F. Dupre, Esq.
Gunderson Dettmer Stough
  Villeneuve Franklin & Hachigian, LLP
610 Lincoln Street
Waltham, Massachusetts  02451
Phone: (781) 795-3610
Fax: (781) 622-1622

Such notices shall be deemed served when received by addressee or, if delivery is not accomplished by reason of some fault of the addressee, when tendered for delivery. Either party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such party at such changed address.

**7.6**    Counterparts. This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

**7.7**    No Ongoing Obligations. Purchaser shall not have any obligations solely by virtue of the provisions of this Agreement to support, maintain or otherwise continue the business operations of Seller or to otherwise market, promote or develop the Purchased Assets after the Closing Date.

**7.8**    Transaction Expenses. Irrespective of whether the Closing is effected, each of Seller and Purchaser shall pay all its own costs and expenses incurred with respect to the negotiation, execution, delivery and performance of this Agreement.

**7.9**    Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller and Purchaser.

**7.10**    Miscellaneous. The parties hereto are independent contractors. Neither party has any express or implied right or authority to assume or create any obligations on behalf of the other or to bind the other to any contract, agreement or undertaking with any third party. Nothing in this Agreement shall be construed to create a partnership, joint venture, employment or

agency relationship between Seller and Purchaser. The terms and conditions stated herein are declared to be severable. If any paragraph, provision, or clause in this Agreement shall be found or be held to be invalid or unenforceable in any jurisdiction in which this Agreement is being performed, the remainder of this Agreement shall be valid and enforceable and the parties shall use good faith to negotiate a substitute, valid and enforceable provision which most nearly effects the parties' intent in entering into this Agreement. Failure by either party to enforce any term of this Agreement shall not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. The terms and conditions of this Agreement shall inure to the benefit of Purchaser, its successors, assigns and other legal representatives, and shall be binding upon Seller, its successor, assigns and other legal representatives.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

**PURCHASER:**

**GOMEZ, INC.**

By: _____

Name: _____

Title: _____

**SELLER**

By: _____

Name: John Witchel

Title:  Chairman of the Board

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first written above:

PURCHASER:                                    SELLER:

GOMEZ, INC.                                   By: _____

By: _____         Name: John Witchel

Name: _____         Title: Chairman of the Board

Title: _____

GDSVF&H\792633.7